United States District Court
Southern District of Texas
**ENTERED**
March 06, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SEBASTIAN C. CARTES, | § | |
| | § | |
| Plaintiff, | § | |
| vs. | § | CIVIL ACTION NO. 4:16-cv-3557 |
| | § | |
| LISA ELLEN PHILLIPS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

This case involves the alleged wrongful removal of one minor child, O.C. P.,  from Paraguay, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention")[1] and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9003 *et seq*.  More specifically, the petitioner, Sebastian C. Cartes ("the petitioner"), initiated an action in this Court, pursuant to the Convention, seeking the return of his three year old daughter, O.C.P., asserting that on or about October 25, 2016, Lisa Ellen Phillips, her mother ("the respondent"), wrongfully removed her from Paraguay and brought her to Texas where she now remains.  The respondent, however, denies that she violated the Convention, asserting, *inter alia*, that the petitioner consented and/or acquiesced to the removal of the child from Paraguay to the United States.

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this matter arises under the Convention and the ICARA, the implementing legislation. Pursuant to the ICARA, state and federal courts have concurrent original jurisdiction over actions arising under the Convention.  *See* 22 U.S.C. § 9003(a).

---

[1] Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980. T.I.A.S No. 11670, 1988 WL 411501, *reprinted in* 51 Fed. Reg. 10,494 (March 26, 1986).

On December 14, 2016, the Court took possession of all passports relative to the child and respondent and ordered that the child not be removed from the jurisdiction of the Court. (*See* Dkt. Nos. 6, 8 & 11.)  The Court, in its Agreed Interim Order, set forth the parameters for parental access to the child pending a full hearing on the merits with regard to this matter.  (*See* Dkt. No. 11).  Subsequent orders setting forth further parameters for parental access to the child were entered on December 30, 2016, January 19, 2017, February 10, 2017 and February 28, 2017, respectively.   (*See* Dkt. Nos. 16, 20, 43 & 64.)

On February 7, 8 and 15, 2017, a full hearing on the merits was held in this Court in the above-captioned matter, during which the Court received documentary evidence and considered sworn testimony.   After considering the evidence, testimony, arguments of counsel and the applicable law, the Court finds that the child was wrongfully removed from Paraguay, her place of habitual residence and, for the reasons set forth below, ORDERS her immediate return to that country[2].   Pursuant to Federal Rule of Civil Procedure 52(a), the Court hereby enters the following findings of fact and conclusions of law.[3]

## II.    CONTENTIONS OF THE PARTIES

### A.    The Petitioner's Contentions

The petitioner contends that he decided to move back to Paraguay in 2015, during the February/March time frame, while completing a rehabilitation period, with the intent to remain there and eventually persuade the respondent and O.C.P. to come thereafter.  Pursuant to their

---

[2] The Court has received the respondent's supplemental statement of admissibility for her offer of proof, (Dkt. No. 56), and rejects it as an improper attempt to relitigate the Court's rulings with regard to certain exhibits without establishing the appropriate context for such.  The respondent's supplemental statement is also rejected as an attempt to raise supplemental objections that should have been made during the course of the hearing on the merits in this matter.
[3] To the extent that any finding of fact should be construed as a conclusion of law it is hereby adopted as such and vice versa.

discussions, the respondent, in fact, traveled with O.C.P. to Paraguay in February 2015.  Over the next seven months, the parties spent the majority of their time together in Paraguay.

In September of 2016, the petitioner traveled to Houston to assist the respondent with moving her personal effects into a storage space from an apartment that she leased at 2207 Bancroft prior to his move to Paraguay.  He contends that shortly after consolidating her personal effects into a smaller storage space, the respondent and O.C.P.  returned to Paraguay on October 18, 2015, with the intent to reside with him on his mother's compound.  He further contends that both parties intended the move to restore meaningfulness to their marital relationship and establish a more secure habitation for their minor child, O.C.P.  He points out that the respondent's move was deliberate and intentional, and not due to coercion on his part because she, too, desired to maintain the marital relationship and a warm familial environment for O.C.P.

 By October 2016, a year later, the petitioner contends, O.C.P. was well-settled in Paraguay as evidenced by the fact that she:  was attending pre-school; had been baptized into the Catholic faith by a local priest; had been receiving medical care from a local pediatrician; had established relationships with the petitioner's family; and was participating in family activities. Therefore, the petitioner contends that on October 25, 2016, when the respondent removed O.C.P. from Paraguay, it was wrongful, without his consent and, therefore, violated the Convention and the ICARA.

With regard to the respondent's claim that the petitioner waived his claim of wrongful removal by consenting to her departure, the petitioner contends that on or about October 24, 2016, he filed a complaint with the Asunción Metropolitan Police, reporting that the respondent was attempting to remove O.C.P. from Paraguay without his consent or authorization.  As a result, the respondent was unable to travel without O.C.P.'s passport.  On October 25, the

petitioner went to the airport, at the behest of his mother, to assist the respondent and O.C.P. in departing Paraguay. There, he executed a document that permitted them to travel to the United States. The following day, according to the petitioner, he filed another complaint reporting that the respondent had taken O.C.P. from Paraguay with the intent of retaining her in the United States in violation of his parental rights and without his consent.

### B.    The Respondent's Contentions

The respondent denies that O.C.P. was removed from Paraguay in violation of the petitioner's rights of custody under Paraguayan law, the Convention and/or the ICARA. In support of her contention, she asserts that O.C.P. never "habitually" resided in Paraguay, as they never intended to establish Paraguay as their residence. In support of her contentions, the respondent asserts that her relationship with the petitioner "ha[d] been turbulent, tempestuous and sometimes violent," resulting in long periods of separation and short periods of reconciliation. She also points to the fact that she executed an apartment lease at 2207 Bancroft in Houston and maintained an apartment there until September 2016, as proof of her intention not to remain in Paraguay.[4] She also points to the fact that she and O.C.P. traveled to other countries in South America and to various cities in the United States between October 2015 and October 2016. With regard to her lengthy stay in Paraguay, the respondent asserts that her initial purpose in visiting Paraguay was to be present for the petitioner's sister's childbirth and depart with O.C.P. shortly thereafter. After several weeks, however, she was persuaded to remain in Paraguay for the holidays, then again for summer vacation and eventually to attempt to rehabilitate their marriage or consummate a dissolution of it.

---

[4]It is important to note that the respondent's monthly payments on the lease were paid by the petitioner's mother, Sarah Cartes, so as to provide a place for O.C.P. and the respondent to reside when visiting Houston from Paraguay. Ms. Cartes stopped making rental payments on the lease in September 2016.

In January 2016, the respondent became involved in a romantic relationship with another individual for whom she became pregnant.  As a consequence, it became apparent to her that she could no longer stay at the compound during her pregnancy and, thus, she contemplated moving either to Buenos Aires or Houston to be with her parents while deciding the fate of her pregnancy.  Therefore, the respondent contends that she and the petitioner never shared any intent to "abandon O.C.P.'s habitual residence at the Bancroft apartment in Houston.  She further contends that she returned to the United States with O.C.P., with the petitioner's knowledge and consent.   Accordingly, she maintains that the petitioner is not entitled to relief under the Convention and/or the ICARA, as O.C.P. was never wrongfully removed from Paraguay.

## III.    FINDINGS OF FACT

The petitioner and respondent are United States citizens who met in 2012 at a drug rehabilitation facility, where both were receiving treatment for drug abuse.  A romantic relationship eventually ensued between them culminating in their marriage on February 16, 2013, in California.  On September 23, 2013, the respondent gave birth to the petitioner's child, O.C.P., also in California.  The evidence supports the conclusion that the marriage was "in distress" almost from its inception.  Discord and conflict marked the parties' entire relationship-- escalating and plummeting from time-to-time, with discussions of divorce mentioned throughout. Nevertheless, the parties sought to maintain their marital relationship and provide a home environment for O.C.P.  Although the parties have defined the period relevant to the instant dispute to include October 18, 2015 to October 24, 2016, they, nonetheless, maintain that earlier periods in their relationship should be considered in determining their intent.

The Court received testimony from various witnesses during a hearing on the merits of this matter, including the petitioner, the respondent, Dr. Jorge Lopez-Benitez, O.C.P.'s

Paraguayan pediatrician, Ana C. Ojeda Gomez de la Fuente, O.C.P.'s preschool teacher, Father Edisson Cazali, the family priest who baptized O.C.P., Sarah Cartes, the petitioner's mother and O.C.P.'s grandmother, and James and Kathleen Phillips, the respondent's parents.  While these are not all the witnesses who testified, the Court is of the view that they are, indeed, critical fact witnesses.  Hence, the Court determines that the testimony of these witnesses is conclusive on the following questions:  (1) what country served as O.C.P.'s country of habitual residence and/or her home state during the period from October 15, 2015 to October 24, 2016; and (b) whether the petitioner's actions at the airport of executing a document that permitted the respondent to leave Paraguay on October 25, 2016, constituted consent and waived his claim that O.C.P. was wrongfully removed from Paraguay.  The Court's summary of its factual findings follows.

The evidence shows, and the Court finds, that the petitioner met the respondent in California on or about March 2012, while admitted in a rehabilitation facility-- "Promises"–due to drug addiction.  While there, the two developed a romantic relationship that resulted in the respondent becoming pregnant with the petitioner's child, O.C.P., and subsequently, marrying him on February 16, 2013.  The respondent has another child, J.P.D., a 10 year old from a prior relationship, who resides with her parents in Houston.  J.P.D.'s primary residence is subject to a geographical restriction of Harris County, Texas and Waller County, Texas, with the respondent's parents retaining the exclusive right to designate such.  The respondent, her parents and J.P.D.'s biological father serve as joint managing conservators for J.P.D.  The respondent's child with the petitioner, O.C.P., was born on September 23, 2013, with two heart defects purportedly associated with the respondent's use of Zofran during her pregnancy.  Prior to O.C.P.'s birth, however, the parties moved from a residence maintained by the petitioner's

mother to a residence in Marina del Rey, California. Within six to eight months of the petitioner's release from Promises, the parties moved to a condominium located at 121 North Post Oak, Houston, Texas, due to health concerns associated with the respondent's mother. The petitioner executed a two-year lease at the Houston condominium in October 2013, with his mother agreeing to cover the monthly rental payments for the duration of the lease term.

Due to a relapse, however, the petitioner and respondent decided to temporarily move to Miami, Florida in January 2014. In Miami, the petitioner was admitted into a drug rehabilitation facility for approximately 30 days. During the petitioner's treatment and up until sometime in April 2014, the respondent and O.C.P. resided in an apartment owned by the petitioner's mother. Thereafter, from April 2014 through June 2014, the parties, together with O.C.P., stayed at the condominium located at 121 North Post Oak, Houston, Texas, until their eviction. In July 2014, the parties moved with O.C.P. into an apartment located at 5521 Beverly Hills, Houston, Texas. In September 2014, the respondent and O.C.P. moved out of the 5521 Beverly Hills, Houston apartment, due to the petitioner's relapse. That same month, the respondent signed a two-year lease on an apartment located at 2207 Bancroft Houston, Texas, with monthly rental payments to be paid by the petitioner's mother. The petitioner continued to reside at the Beverly Hills Houston apartment until his admittance in October 2014 into a 90-day drug rehabilitation facility in Austin, Texas, where he remained until January 2015.

In mid-November 2014, the respondent and O.C.P. visited Asunción, Paraguay, staying at the petitioner's mother's home and returning to Houston in early January 2015. In February 2015, after the petitioner was released from the rehabilitation facility, the parties, together with O.C.P., traveled to Asunción, Paraguay to visit the petitioner's family. While there, the parties resided at the petitioner's mother's house. It is undisputed that the petitioner intended to move to

Paraguay, where he grew up, as soon as he completed rehabilitation.  He testified, and the Court finds, that his intentions were to stabilize his life, specifically his marriage, and start supporting his family.  The petitioner, respondent and O.C.P remained in Paraguay from around February 14, 2015, through August 25, 2015, save for three exceptions:  (1) From March 20 – April 10, the respondent and O.C.P. traveled to California and Texas; (2) from June 24 - July 5, they traveled again to Texas; and (3) from August 25 – October 17, the parties traveled to Florida and Texas for two months.

During her stay in Paraguay, the respondent worked for a short period in the family's cattle business.  The respondent and O.C.P. lived in the petitioner's mother's house during their stay.  Also toward the end of their stay, the petitioner's mother offered to construct a residence on her compound so that the petitioner and respondent, and particularly O.C.P., would have separate living quarters.  Both the petitioner and respondent, to some extent, participated in finalizing the plans for a separate residence on the petitioner's mother's compound.  When the respondent returned to Paraguay on October 18, 2015, she and O.C.P. remained in Paraguay until October 24, 2016.

The Court finds that prior to the respondent's return to Paraguay in October 2015, the petitioner and respondent traveled to Houston.  During this visit, the petitioner moved respondent's property out of the parties' storage unit into a smaller unit.  At that time, little or nothing in the respondent's Bancroft apartment was moved.  Afterward, the petitioner returned to Paraguay with most of his possessions.  On October 18, the respondent and O.C.P. returned to Paraguay.

Though residing in Paraguay, the respondent maintained her lease on the Bancroft apartment in Houston.  During this time, the petitioner's mother rendered monthly rental

payments on the Bancroft lease, provided the respondent with a credit card for all household and food purchases and other necessities, paid for the parties' medical insurance premiums, including reimbursing the respondent's mother for the cost of coverage for O.C.P.'s COBRA policy maintained by the respondent's mother's Texas employer, and completed building the separate residence on her compound to house the parties and O.C.P.  While staying in Paraguay, the respondent traveled, mostly unaccompanied, to Uruguay, Florida, Houston, Miami and Ohio, with all expenses paid for by the petitioner's mother.  During her trips to Uruguay, in particular, the respondent mainly traveled alone and remained away from O.C.P. for several weeks at a time.

In December 20, 2015, O.C.P. was baptized in Asunción, Paraguay.  Both parties were present for and supportive of her baptism.  In February 2016, O.C.P. was enrolled in and began attending a pre-kindergarten/daycare program at Maria's Pre-School in Paraguay.  She regularly attended school until her removal from Paraguay in October 2016.  Given the length of her extended stay in Paraguay, O.C.P. received medical care for any illnesses from Dr. Jorge Lopez-Benitez, a local pediatrician.

On February 4, 2016, the petitioner filed an Original Petition for Divorce in Harris County, Texas, which was non-suited by the petitioner on July 11, 2016, after his attorney determined that the Harris County courts did not have jurisdiction of the custody case or the divorce.

On or about October 18, 2016, the respondent revealed to the petitioner's mother that she was pregnant with a child by someone other than the petitioner—a boyfriend she purportedly met in Buenos Aires.  Nevertheless, she sought the assistance of the petitioner's mother to direct her to a physician to confirm her pregnancy.  Sometime earlier, around September 20, 2016, the

respondent had informed her mother of her pregnancy.  With a September 30, 2016 lease-end date for the Bancroft apartment she maintained, the respondent's father rented a storage unit in Houston to move and store her remaining belongings from the Bancroft apartment.

On October 24, 2016, the respondent attempted to leave Paraguay without proper clearance documentation for O.C.P.  On October 25, 2016, the petitioner, at the request of his mother, traveled to the airport to execute a document stating his commitment to show the child's missing diplomatic passport to immigration officials in Paraguay upon his mother's return to Paraguay, permitting the respondent and O.C.P. to travel Houston to visit her family.  Except for a visit to Houston for about two weeks in January 2016, O.C.P. spent the large majority of her time, during the relevant period, in Asunción, Paraguay.

The respondent contends that the evidence fails to support the petitioner's contentions that O.C.P. was wrongfully removed from her country of habitual residence.  The Court finds otherwise and that the respondent's testimony supports the petitioner's claim for relief.  In attempting to determine the intentions of the parties, the Court examined both the parties' testimony in relation to their conduct and/or actions.  The testimony of the petitioner, and his mother, support a finding that the respondent followed the petitioner to Paraguay in an attempt to repair and/or reestablish the parties' marriage and family.  Therefore, the Court finds that on critical facts, the testimony of the respondent is unpersuasive and unreliable.  This finding is based on the respondent's courtroom behavior, *i.e.*, the manner of her testimony, the conflicts in her testimony, and her actions during the disputed periods.  The testimony of the respondent and the inferences that logically flow from it, coupled with the respondent's conduct, support the Court's findings.  A few of the inconsistent statements made by the respondent, with regard to her residency, are set forth below:

1) [Resp't to Edwina, May 26, 2015]: "I am trying to figure out my next move. I am not sure I will be traveling very often to the [United] States for a while." (Resp't Ex. No. 38).

2) "I cannot continue to live with him [petitioner] doing this to everyone. . . . I really don't know what to do." (Resp't Ex. No. 40; Bates 1756).

3) [Resp't to Pet'r] "I don't have to even if it means working for nothing in the States." (Resp't Ex. No. 41, Bates 1761].

4) "I'm planning on returning to the States." (Resp't Ex. No. 44; Bates 2142; August 14, 2015).

5) [Pet'r to Resp't, Sept. 2015] "There are some tickets for you and [O.C.P.] that go from Houston to Paraguay." (Resp't Ex. No. 47; Bates 1446).

6) [Sept. 19, 2015]: "I'm here [Paraguay] 'till December [2015, but after that I'm good to go. . . . I'm still looking for where I want to live." (Resp't Ex. No. 48; Bates 1412].

7) "I went for a vacation a couple of times to get away (from Paraguay)." (Resp't. Ex. No. 50; Bates 1416].

8) "I came to (Houston) to have lunch with my family for a while . . . [living] in my mother's house." (Resp't Ex. No. 58).

9) [Resp't to Edwina, March 1, 2016] "My divorce is going to be finalized in the next few months and after that I would not be staying in Texas." (Resp't Ex. No. 62; Bates 1346).

10) [Resp't to Pet'r, April 5, 2016] "You are lucky I was willing to stay close to you, but I can leave to the U.S." (Resp't Ex. No. 65; Bates 1852).

11) [Resp't to Pet'r] "I would like to leave Paraguay. . . . There is no room in my mother's house." (Resp't Ex. No. 70; Bates 1251).

Finally, the respondent testified that the petitioner was physically and psychologically abusive to her at times. Nevertheless, the testimony elicited at the hearing establishes that both parties tended to act aggressively during arguments. To the extent that the respondent attempts to allege by her testimony in this regard that the petitioner would be a danger to O.C.P., the

Court is unpersuaded by the respondent's claim.  As a consequence, the Court finds that the parties' last shared intention was for O.C.P. to habitually reside in Paraguay.  The Court further finds that the respondent was not involuntarily coerced to remain in Paraguay during the relevant period.

## IV.    CONCLUSIONS OF LAW

The Convention governs civil proceedings filed in signatory countries for the recovery of abducted children during domestic disputes.  *See Abbott v. Abbott*, 560 U.S. 1, 8, 130 S. Ct. 1983, 1989, 176 L. Ed.2d 789 (2010).  Both the United States and Paraguay are signatories to the Convention.  The purpose underlying the Convention is twofold:  (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State"; and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  *Id.* (quoting Convention, art. 1).  "The Convention provides that a child abducted in violation of 'rights of custody' must be returned to the child's country of habitual residence, unless certain exceptions apply."  *Abbott*, 560 U.S. at 5, 130 S. Ct. at 1987.

The ICARA establishes the procedures for the implementation of the Convention in the United States.  *Abbott*, 560 U.S. at 9, 130 S. Ct. at 1989.  Federal district courts and state courts "have concurrent original jurisdiction of actions arising under the Convention."  22 U.S.C. § 9003(a).  Specifically, the ICARA provides that "[a]ny person seeking . . . the return of a child . . . may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."  *Id.* § 9003(b).  Congress has expressly declared that the provisions in the ICARA "are in addition to and not in lieu of the

provisions of the Convention." *Id.* § 9001(b)(2).  In this case, it is undisputed that O.C.P. was located in Bellaire, Harris County, Texas, a city within the jurisdiction of this Court when the petitioner filed his petition for return.

"When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott*, 560 U.S. at 9, 130 S. Ct. at 1989 (citing Convention, arts. 4, 12).  A removal or retention is wrongful when: (1) "it is in breach of rights of custody attributed to a person . . .  either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention;" and (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."  Convention art. 3.  The Convention defines "rights of custody [to] include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Convention art. 5(a).  Therefore, to establish his claim for wrongful removal or retention, the petitioner must prove the following elements by a preponderance of the evidence:  (1) "the respondent removed or retained the child somewhere other than the child's habitual residence"; (2) the removal or retention violated the petitioner's 'rights of custody' under the habitual residence nation's laws"; and (3) "at the time of removal or retention, those rights were actually [being] exercised, either jointly or alone, or would have been so exercised but for the removal or retention."  *See Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012) (internal citations omitted).

Nevertheless, the Court is "not bound to order" the return of a child if the party opposing the return establishes, *inter alia*, that  the petitioner had failed to establish wrongful removal by a preponderance of  the evidence and/or overcome  the respondent's defense that the petitioner

waived his claim of wrongful removal by giving his consent.  The respondent must also establish her consent defense by a preponderance of the evidence.

This Court is of the opinion that the petitioner has satisfied all three elements of wrongful removal by a preponderance of the evidence and that the respondent has not established her affirmative defense by the same standard.

### A.     What is the Child's Country of Habitual Residence?

When evaluating a claim under the Convention, the Court's "inquiry is limited to determining whether or not the child has been wrongfully removed from [his or her] country of 'habitual residence.'" *Berezowsky v. Ojeda*, 765 F.3d 456, 465 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1531, 191 L. Ed. 2d 559 (2015) (internal citations and quotations omitted).  The Court must not engage in an assessment of the underlying custody dispute.  *Id.*  Thus, the threshold question now before the Court in this alleged wrongful removal case necessarily becomes whether Paraguay was O.C.P.'s country of habitual residence.  *Larbie*, 690 F.3d at 310 (citing *Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir. 2001)).  This Court answers in the affirmative.

The term "habitual residence" is not defined by the Convention.  *Larbie*, 690 F.3d at 310 (citing *Mozes*, 239 F.3d at 1071; *see* Convention, arts. 1 - 45 (providing no definition for habitual residence)).  Nor does the ICARA provide any guidance.  *See* 22 U.S.C. § 9002.  Thus, courts have created various definitions and frameworks for determining a child's country of habitual residence.  *See, e.g.*, *Mozes*, 239 F.3d at 1080 – 81(noting that a child's country of habitual residence cannot be altered without the acquiescence of the noncustodial parent); *Robert v. Tesson*, 507 F.3d 981, 989 - 95 (6th Cir. 2007) (reasoning that principal importance should be placed on the "child's experiences," as established by the child's adaptation and "degree of settled purpose," without accounting for the parents' "subjective intent.")

More recently, the Fifth Circuit "joined 'the majority' of circuits that 'have adopted an approach that begins with the parents' intent or settled purpose regarding their child's residence.'" *Larbie*, 690 F.3d at 310. "This approach does not ignore the child's experience, but rather gives greater weight to the parents' subjective intentions relative to the child's age." *Id.* To this end, the Fifth Circuit has reasoned that a court's "inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Id.* (quoting *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004)). When determining a child's country of habitual residence, the analysis must center on "the parents' shared intent or settled purpose regarding their child's residence." *Larbie*, 690 F.3d at 310 (quoting *Nicolson v. Pappalardo*, 605 F.3d 100, 104 & n. 2 (1st Cir. 2010)). In applying the shared intent approach, a court is also required to make inquiry into whether the child has lived in the country for "an appreciable period of time . . . that is sufficient for acclimatization." *Saldivar v. Rodela*, 879 F. Supp.2d 610, 618 – 19 (W.D. Tex. 2012). Hence, the threshold test becomes "whether both parents intended for the [child] to 'abandon the [habitual residence] left behind.'" *Larbie*, 690 F.3d at 310 – 11 (internal citations omitted). When parents disagree on the place of the child's habitual residence, a district court should look to the last time the parents' intentions were shared. *Berezowsky*, 765 F.3d at 479. In the absence of such shared intent, "prior habitual residence should be deemed supplanted only where 'the objective facts point unequivocally' to this conclusion." *Id.* (citing *Mozes*, 239 F.3d at 1082).

Personal uncertainties about abandoning or leaving the habitual residence or establishing a new habitual residence, including doubts about continuing the marriage, however, are generally insufficient to negate shared parental intent. *Berezowsky*, 765 F.3d at 466; *Mozes*, 239 F.3d at

1076; *Feder v. Evans–Feder*, 63 F.3d 217 (3d Cir. 1995).   One parent's reservations do not negate shared intent.   *Mozes*, 239 F.3d at 1077.

Consistent with the goals of the Convention and applicable case law, this Court concludes that a preponderance of the evidence establishes that Paraguay was O.C.P.'s habitual residence immediately prior to her wrongful removal to the United States by the respondent.   The Court further concludes that such a determination is necessarily dependent on the parents' shared intentions regarding the child's presence in the country of habitual residence coupled with an analysis of the child's circumstances in that particular country.   The preponderance of the evidence establishes that in October 2015, O.C.P., traveled with the respondent on a one-way ticket from Houston, Texas to Paraguay to live with the petitioner and his family for nearly a year, while traveling intermittently.   The respondent was not coerced to involuntarily remain in Paraguay or to change O.C.P.'s habitual residence to Paraguay.   Moreover, O.C.P. quickly acclimated to Paraguay.   While in Paraguay, for example, she:  was baptized into the Catholic faith by the petitioner's family's priest; was enrolled in and began attending a pre-kindergarten/daycare program at Maria's Pre-School; received necessary medical care from a local pediatrician there; and established relationships with the petitioner's family, including participating in various family activities.

Although the petitioner and respondent may have harbored very distinct views of Paraguay, both, nevertheless, agreed to move to that country and live there with O.C.P. and proceeded as parents determined to make a home for themselves and their minor child—they assisted in establishing a separate living quarters on the petitioner's mother's compound, they worked for the family's cattle business, arranged for O.C.P. to receive necessary medical care from a Paraguayan pediatrician and participated in consultations with him, and permitted O.C.P.

to be enrolled in pre-school for a period of, at the very least, 8 months.  Further, the stability of the residence in Paraguay, combined with O.C.P.'s regular attendance in school, the respondent and petitioner's employment status and the petitioner's mother's level of involvement with the child all weigh in favor of this Court finding O.C.P. "settled" in Paraguay.  The fact that the respondent never intended to remain in Paraguay permanently does not alter the parties' settled purpose or this Court's finding.

### B.   Was the Child's Removal in Breach of the Petitioner's "Rights of Custody"?

The Convention defines "rights of custody" to "include rights relating to the care of the person of the child, and, in particular, the right to determine the child's place of residence." Convention, art. 5(a).  The Convention does not require any sort of formal custody order or private legal agreement as rights of custody may exist by mere operation of law.  Convention, art. 3.  The term "rights of custody" is to be broadly construed so as to bring as many cases as possible under the purview of the Convention.  *Abbott*, 560 U.S. at 16, 130 S. Ct. at 1993; *Altamiranda Vale v. Avila*, 538 F.3d 581, 586 (7th Cir. 2008).  The petitioner is not required to have sole or exclusive custody over the child and, in fact, the Convention recognizes that custody rights can be "decreed jointly or alone."  *Abbott*, 560 U.S. at 11, 130 S. Ct. at 1990.  Whether the petitioner's rights of custody have been breached must be determined based "under the law of the State in which the child was habitually resident immediately before the removal or retention."  Convention art. 3(a); *Larbie*, 690 F.3d at 307 (whether removal or retention violated petitioner's rights of custody must be established "under the habitual residence nation's laws"); *see also Sealed Appellant*, 394 F.3d at 343 (reasoning that in the absence of a formal custody agreement between the parties, courts are to apply the laws of the country of the child's habitual

residence to determine if the petitioner has "rights of custody" within the Convention's meaning that have been violated).

The petitioner has rights of custody under Paraguayan law, including rights relating to the care of O.C.P. as well as the right to determine her place of residence.  (*See* Dkt. No. 2).  The Code of Childhood and Adolescent Rights of Paraguay grants custody rights to both mothers and fathers.  (*See* Dkt. No. 2).  Although the petitioner and the respondent possess joint parental authority under Paraguayan law, the Convention, nevertheless, provides that removal is wrongful, when despite both parents' joint custodial rights, one parent's removal of the children breaches those rights or interferes with the other parent's ability to exercise those rights.  Convention, art. 3.  The preponderance of the evidence establishes that the removal of O.C.P. from Paraguay infringed upon and breached the petitioner's rights of custody.  Having established that the petitioner possessed rights of custody that were breached at the time of O.C.P.'s wrongful removal, the petitioner need now only establish that he was exercising those rights at the time of the removal.

### C. Whether the Petitioner Was Exercising "Rights of Custody" Prior to the Child's Wrongful Removal?

The Court concludes that the petitioner has established by a preponderance of the evidence that he was exercising his rights of custody prior to O.C.P.'s removal from Paraguay. Neither the Convention nor the ICARA define what constitutes an "exercise" of rights of custody.  Courts have, however, interpreted the term broadly and employed its simplest, ordinary meaning so as to avoid delving into consideration of the underlying custody dispute.  *Sealed Appellant*, 394 F.3d at 344.  The Fifth Circuit has noted that it is "relatively easy" to show that a petitioner was exercising his rights of custody, either jointly or alone, at the time of removal or would have exercised them but for the removal or retention.  *See Larbie*, 690 F.3d at 307 (citing Elisa Pérez–Vera, Explanatory Report ¶ 73, in 3 Hague Conference on Private Int'l Law, Acts

and Documents of the Fourteenth Session, Child Abduction 426, 428 (1982) ("Explanatory Report")).[5]  It has further reasoned that "in the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of [custody] rights."  *Sealed Appellant*, 394 F.3d at 345.  "To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child."  (*Id.*).

The preponderance of the evidence establishes that the petitioner, as the live-in joint custodian and guardian of O.C.P. in Paraguay, exercised his rights of custody on a daily basis by providing for her general welfare, including, *inter alia*, providing for her medical care, education, food and clothing and even occasionally taking her back and forth to school and/or medical appointments.  (*See* Dkt. No. 1, Ex. B.).

### D.     The Respondent's Affirmative Defenses

Once a petitioner shows by a preponderance of the evidence that the removal or retention of the child was wrongful, the burden shifts to the respondent to prove any applicable affirmative defenses.  *See* 22 U.S.C. § 9003(e).  "When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply."  *Abbott*, 560 U.S. at 9, 130 S. Ct. at 1989 (citing Convention, arts. 4, 12).   The Convention recognizes several narrow exceptions or defenses to the return of a child wrongfully removed or retained from her country of habitual residence.  22 U.S.C. § 9003(e)(2)(A, B); Convention, arts. 12, 13, 20.

---

[5] "Elisa Pérez–Vera was the official Hague Conference reporter, and her explanatory report is 'recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.'"  *Mozes*, 239 F.3d at 1070 n. 3 (citations omitted); *see also Tesson*, 507 F.3d at  988 n. 3 (noting that the Report is regarded as "an authoritative source for interpreting the Convention's provisions" (citations omitted)).

In her answer to the petition, the respondent has pleaded the following affirmative defenses under the Convention:  (1) that the petitioner cannot establish his burden under Article 3 of the Convention and is not entitled to any relief because O.C.P. was not habitually residing in Paraguay prior to her alleged wrongful removal; and (2) that the petitioner consented to the child's removal from Paraguay and retention in the United States, Southern District of Texas.

The Convention provides that a child may not be ordered to return to her country of habitual residence if the respondent and/or removing party can establish, by a preponderance of the evidence, that the petitioner "had consented to or subsequently acquiesced in the removal or retention."  Convention, art. 13(a); 42 U.S.C. § 11603(e)(2)(B).  "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."  *In re J.J.L.-P.*, 256 S.W.3d 363, 375 (Tex. App.—San Antonio 2008, no pet.) (citing *Baxter v. Baxter*, 423 F.3d 363, 371 (3rd Cir. 2005); *see Gonzalez–Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001)).  Thus, the consent inquiry focuses on the subjective intent of the consenting parent.  *Id.* To this end, the Fifth Circuit has warned, "[i]n examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside [his or her] home country."  *Larbie*, 690 F.3d at 309 ("The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account.") (internal quotation marks omitted).  The Third Circuit, in *Baxter v. Baxter*, further explained, "[t]he fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." 423 F.3d 363, 371 - 72 (3d Cir. 2005) (citing *See Fabri v. Pritikin-Fabri*, 221 F. Supp.2d 859, 871 - 72 (N.D. Ill. 2001) ("Many cases begin with a parent's taking the child away from home

for a vacation or visit with the consent of the other parent, but nevertheless result in a Hague Convention order compelling the child's return") (other citations omitted)).

The record evidence does not suggest that, at or near the time of O.C.P.'s removal, the petitioner consented to or took any subsequent action to acquiesce in O.C.P.'s habitual residence being changed from Paraguay to the United States.  By assisting the respondent at the airport at his mother's insistence, the petitioner did not waive his right to complain in the event that the respondent refused to return to Paraguay with O.C.P.  The petitioner's pursuit of the respondent and utilization of the remedies available to him under the Convention and through local law enforcement to secure O.C.P.'s prompt return to Paraguay further undermines the respondent's consent defense.

### E.    Whether the Petitioner Is Entitled to Attorney's Fees and Costs?

The petitioner seeks to recover attorneys' fees and costs necessary for him to recover O.C.P. pursuant to 22 U.S.C. § 9007.  He has only recently filed proof of such expenditures to date.  For cases arising under the Convention, the ICARA provides that "[a]ny court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster homes or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate."  22 U.S.C. § 9007(b)(3); *Sealed Appellant*, 394 F.3d at 346; *see also Saldivar*, 879 F. Supp.2d at 632 (quoting *Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir. 2004) (reasoning that "[t]he respondent has the burden to show that an award of fees or expenses would be 'clearly inappropriate.'")).

The Court determines that the petitioner is entitled to recover his necessary expenses incurred "by or on behalf of the petitioner," including court costs, legal fees, and transportation costs related to the return of O.C.P.  A separate order will issue regarding the petitioner's costs recoverable and any responses and/or objections thereto.

## V.    CONCLUSION

The Court's task in this case is very limited.  It is not authorized to determine the merits of any custody dispute between the parties, but rather whether O.C.P. was wrongfully removed from her country of habitual residence.  Based on the foregoing, this Court hereby determines the following:

1. The petitioner, Sebastian C. Cartes, has satisfied his burden to establish that his child O.C.P., was wrongfully removed from her country of habitual residence in Paraguay;

2. The respondent, Lisa Ellen Phillips, has failed to prove by a preponderance of the evidence that the petitioner, Sebastian C. Cartes, consented to her removal of O.C.P. from Paraguay and retention in the United States;

3. The verified Petition for Return of Child Under The Hague Convention is **GRANTED**.  Accordingly, the respondent, Lisa Ellen Phillips, is hereby required to promptly return the child, O.C.P., to Paraguay, her country of habitual residence, or release her to a court-approved designee to facilitate her travel to Paraguay; and

4. The petitioner, Sebastian C. Cartes, is entitled to recover certain necessary expenses incurred, including court costs, legal fees and transportation costs related to the return of O.C.P. to Paraguay.  The petitioner shall submit to this Court a motion for fees pursuant to the lodestar method, supported by an affidavit in this regard, within ten (10) days of this Order.  The respondent shall have five (5) days thereafter to file any response to the petitioner's motion, indicating why the requested award is "clearly inappropriate."

The Court hereby retains jurisdiction of this matter to determine any appropriate fee award and to enforce repatriation of the child to Paraguay.

It is so **ORDERED**.

SIGNED on this 6th day of March, 2017.

 

_____
Kenneth M. Hoyt
United States District Judge